No. 21-13455

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

WILLIAM HOWER MELENDEZ,

*Plaintiff-Appellee,*

v.

MARK S. INCH, DONALD DAVIS, JEFFREY R. MCCLENNAN, JOHN PALMER, STATE OF FLORIDA DEPARTMENT OF CORRECTIONS,

*Defendant-Appellants.*

Appeal from the United States District Court
for the Middle District of Florida
Case No. 3:20-cv-01023
The Honorable Brian J. Davis

## PLAINTIFF-APPELLEE'S RESPONSE BRIEF

Lee D. Wedekind, III
NELSON MULLINS RILEY &
SCARBOROUGH LLP
50 North Laura St., Ste. 4100
Jacksonville, FL 32202

David F. Oyer*
RODERICK & SOLANGE MACARTHUR
JUSTICE CENTER
501 H St. NE, Suite 275
Washington, DC 20002

*Admitted only in California and practicing
under supervision of the MacArthur Justice
Center*

Daniel M. Greenfield
Alexa Van Brunt
Rosalind Dillon
Danielle Berkowsky (*pro hac vice*)
Noor Tarabishy (*pro hac vice*)
RODERICK AND SOLANGE MACARTHUR
JUSTICE CENTER
NORTHWESTERN PRITZKER
SCHOOL OF LAW
375 East Chicago Ave.
Chicago, Illinois 60611
(312) 503-8538
daniel-greenfield@law.northwestern.edu

*Attorneys for Plaintiff-Appellee William Hower Melendez*

## CERTIFICATE OF INTERESTED PERSONS & CORPORATE DISCLOSURE STATEMENT

The undersigned hereby certifies the following list of trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that may have an interest in the outcome of this appeal:

1.　　Alexander, Mark G.

2.　　Astarita, Julianna

3.　　Ateberry, Robert

4.　　Berkowsky, Danielle

5.　　Brown, Robert

6.　　Bryant, Terry

7.　　Chandler, Jamaal

8.　　Chauncey, David E.

9.　　Davis, The Honorable Brian J.

10.　　Davis, Donald

11.　　Department of Corrections, State of Florida

12.　　Dillon, Rosalind

13.　　Duke, Samantha C.

14.　　Filler, Maggie E.

15.　　Folsom, Billy

16.　　Geiger, M.

17.　　Greenfield, Daniel

18.　　Grosholz, Jeffrey J.

19.　　Gwara, Adam

20.　　Hackett, Leonard T.

21. Hall, William

22. Henderson, Greg

23. Hummel, Erich

24. Hunter, P.

25. Inch, Mark S.

26. Knott, Steven

27. McClellan, Jeffrey R.

28. Melendez, William H.

29. Moreland, Justin

30. Newman, Luke

31. Nosbich, Charles

32. Oliva, Agderemme

33. Oyer, David

34. Palmer, John

35. Philbert, Daniel

36. Reddish, Barry

37. Roderick & Solange MacArthur Justice Center

38. Rollins, James

39. Smith, Nicole Sieb

40. Tarabishy, Noor

41. Tomlinson, Kevin

42. Toomey, Joel

43. Van Allen, Jack

44. Van Brunt, Alexa

45. Waters, Kelly Dunn

46. Webb, Lloyd

47. Wedekind, Lee D., III

48. Williams, Colin

49. Williams, Eugene

50. Willis, Jonathan

51. Woodall, Ronnie

52. Woods, Brandon

Pursuant to Eleventh Circuit Rule 26.1-3, the undersigned further certifies that no publicly traded company or corporation has an interest in the outcome of the case or appeal.

Dated: January 12, 2022                    Respectfully Submitted,

                                           *s/ Daniel M. Greenfield*
                                           Daniel M. Greenfield

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellee William Melendez respectfully submits that oral argument is unnecessary in this interlocutory appeal of a now-expired preliminary injunction.

By the clear terms of the Prison Litigation Reform Act (PLRA), preliminary injunctions in prisoner cases "automatically expire" 90 days after their entry "unless" the district court converts the preliminary injunction into a permanent injunction. 18 U.S.C. § 3626(a)(2); *Ga. Advoc. Off. v. Jackson*, 4 F.4th 1200, 1207, 1209 (11th Cir. 2021); *United States v. Sec'y, Fla. Dep't of Corr.*, 778 F.3d 1223, 1227 (11th Cir. 2015). The district court did not convert the preliminary injunction into a permanent injunction. Defendants-Appellants, officials of the Florida Department of Corrections (FDC), concede that the preliminary injunction therefore expired on January 4, 2022. OB47.[1]

This Court has unambiguously held that such expiration by operation of the PLRA moots any appeal; is not salvaged by the exception to the mootness doctrine FDC invokes on appeal; and divests this Court of jurisdiction. *E.g.*, *Ga. Advoc. Off.*, 4 F.4th at 1207, 1210, 1216; *Sec'y, Fla. Dep't of Corr.*, 778 F.3d at 1228-29. Under such circumstances, this Court's "only function remaining" is to "dismiss[] the

_____

[1] Citations to FDC's opening brief on appeal are denoted OB##; to FDC's emergency motion to stay on appeal, SB##; to plaintiff's opposition to the motion to stay, PO##; and to FDC's motion to reconsider, RM##.

cause" for lack of jurisdiction. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (citing *Ex parte McCardle*, 74 U.S. 506, 514 (1868)).

At this interlocutory stage, no other issue is before this Court. Melendez therefore respectfully suggests that this case should be dismissed on jurisdictional grounds without oral argument to conserve judicial resources. *See* Fed. R. App. P. 34 (a)(2).

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ................................................ i

TABLE OF AUTHORITIES ....................................................................... v

STATEMENT OF JURISDICTION........................................................................1

STATEMENT OF THE ISSUES...........................................................................1

INTRODUCTION ..............................................................................................2

STATEMENT OF THE CASE.............................................................................3

I.   Background Facts. ......................................................................................3

   A.  Melendez Repeatedly Attempts Suicide And Engages In Life-Threating
       Self-Mutilation During His Five Years In Solitary Confinement...................3

   B.  FDC's Preposterous Security Justifications. ....................................................7

   C.  The District Court Orders Melendez Transferred To An Inpatient
       Psychiatric Facility. ............................................................................9

   D.  FDC Fast-Tracks Melendez Through Inpatient Psychiatric Care And
       Returns Him To Solitary Confinement. ........................................................14

II.  Procedural History ...............................................................................16

STANDARD OF REVIEW ..............................................................................17

SUMMARY OF ARGUMENT .........................................................................17

ARGUMENT .....................................................................................................18

I.   This Court Lacks Jurisdiction To Review This Moot Appeal. ........................18

II.  In The Alternative, The District Court Did Not Abuse Its Discretion In
     Ordering A Preliminary Injunction Necessary To Preserve Melendez's
     Life......................................................................................................23

   A.  The District Court Exercised Appropriate Discretion In Declining To
       Hold An Evidentiary Hearing.......................................................................23

   B.  The District Court's Order Complied With The Preliminary-Injunction
       Standard. ...........................................................................................31

       1.   Melendez Is Likely To Succeed On His Eighth Amendment Claims. .......31

       2.   Melendez Will Suffer Irreparable Harm Absent An Injunction. ...............41

3.   The Balance Of The Harms And The Public Interest Weigh In Favor Of The Preliminary Injunction. ..................................................................44

C.   The Injunction Complied With The PLRA. ....................................................46

D.   FDC's Remaining Arguments Are Beyond Frivolous. ...................................49

CONCLUSION .............................................................................................................52

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al Najjar v. Ashcroft,*
    273 F.3d 1330 (11th Cir. 2001) ........................................................23

*Anderson v. Coughlin,*
    757 F.2d 33 (2d Cir. 1985) ..............................................................34

*Apodaca v. Raemisch,*
    139 S. Ct. 5 (2018) ..........................................................................36

*Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Ins.*
    *Co.,*
    714 F.3d 424 (6th Cir. 2013) ...........................................................19

*Baker v. Bank of Am., N.A.,*
    837 F. App'x 754 (11th Cir. 2020) ...................................................24

*Bass v. Perrin,*
    170 F.3d 1312 (11th Cir. 1999) ........................................................35

*BellSouth Telecommunications, Inc. v. MCIMetro Access*
    *Transmission Servs., LLC,*
    425 F.3d 964 (11th Cir. 2005) ..........................................................30

*Brooks v. Warden,*
    800 F.3d 1295 (11th Cir. 2015) ........................................................35

*Brown v. Plata,*
    563 U.S. 493 (2011) ...................................................................31, 46

*Bryant v. Jones,*
    575 F.3d 1281 (11th Cir. 2009) ........................................................24

*Budd v. Motley,*
    711 F.3d 840 (7th Cir. 2013) ...........................................................35

*Caldwell v. Warden, FCI Talladega,*
    748 F.3d 1090 (11th Cir. 2014) ........................................................37

*Chandler v. Baird*,
   926 F.2d 1057 (11th Cir. 1991) ........................................35

*Chandler v. Crosby*,
   379 F.3d 1278 (11th Cir. 2004) ........................................31

*Christian Coal. of Fla., Inc. v. United States*,
   662 F.3d 1182 (11th Cir. 2011) ........................................21

*City of L.A. v. Lyons*,
   461 U.S. 95 (1983)........................................................20

*Coleman v. Brown*,
   428 F. App'x 743 (9th Cir. 2011) ......................................51

*Cumulus Media, Inc. v. Clear Channel Comms., Inc.*,
   304 F.3d 1167 (11th Cir. 2002) ........................................30

*Cunningham v. Adams*,
   808 F.2d 815 (11th Cir. 1987) ........................................41

*Davis v. Ayala*,
   576 U.S. 257 (2015)......................................................37

*Delaney v. DeTella*,
   256 F.3d 679 (7th Cir. 2001) ..........................................34

*Democratic Exec. Comm. of Fla. v. Lee*,
   915 F.3d 1312 (11th Cir. 2019) ........................................45

*Disability Rights Montana, Inc. v. Batista*,
   930 F.3d 1090 (9th Cir. 2019) ........................................33

*Edmisten v. Werholtz*,
   287 F. App'x 728 (10th Cir. 2008) .............................44, 45

*Edmo v. Corizon, Inc.*,
   935 F.3d 757 (9th Cir. 2019) ..........................................19

*Farmer v. Brennan*,
   511 U.S. 825 (1994)..........................................29, 31, 32

vi

*Fed. Trade Comm'n v. Vylah Tec, LLC,*
 727 F. App'x 998 (11th Cir. 2018) ....................................25

*Ffrench v. Ffrench,*
 781 F. App'x 930 (11th Cir. 2019) ....................................24

*Finley v. Huss,*
 723 F. App'x 294 (6th Cir. 2018) ................................33, 42

*Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.,*
 320 F.3d 1205 (11th Cir. 2003) ........................................25

*Ga. Advoc. Off. v. Jackson,*
 4 F.4th 1200 (11th Cir. 2001) ....................................*passim*

*Gates v. Cook,*
 376 F.3d 323 (5th Cir. 2004) ............................................34

*Gonzales v. Governor of Ga.,*
 978 F.3d 1266 (11th Cir. 2020) ........................................31

*Hardy v. Broward Cnty. Sheriff's Off.,*
 238 F. App'x 435 (11th Cir. 2007) ....................................24

*Helling v. McKinney,*
 509 U.S. 25 (1993) ............................................................31

*Hill v. Nicholson,*
 829 F. App'x. 141 (7th Cir. 2020) ....................................35

*Hoffer v. Sec'y, Fla. Dep't of Corr.,*
 973 F.3d 1263 (11th Cir. 2020) ........................................52

*Hutcherson v. Riley,*
 468 F.3d 750 (11th Cir. 2006) ..........................................50

*Jenkins v. Dep't of Corr.,*
 518 S.E.2d 730 (Ga. Ct. App. 1999) ................................49

*Jones v. Caruso,*
 569 F.3d 258 (11th Cir. 2009) ..........................................44

*Jones v. Governor of Fla.,*
  950 F.3d 795 (11th Cir. 2020) ....................................................17, 31

*Matz v. Frank,*
  340 F. App'x 323 (7th Cir. 2009) ..............................................33

*McCray v. Burrell,*
  516 F.2d 357 (4th Cir. 1975) .......................................................33

*McDonald's Corp. v. Robertson,*
  147 F.3d 1301 (11th Cir. 1998) ...............................................25, 26

*Meachum v. Fano,*
  427 U.S. 215 (1976) .....................................................................51

*Melendres v. Arpaio,*
  695 F.3d 990 (9th Cir. 2012) .......................................................41

*Mitchell v. Rice,*
  954 F.2d 187 (4th Cir. 1992) .......................................................34

*Molina v. Aurora Loan Servs., LLC,*
  635 F. App'x 618 (11th Cir. 2015) .............................................24

*Montayne v. Haymes,*
  427 U.S. 236 (1976) .....................................................................51

*Morales Feliciano v. Rullan,*
  378 F.3d 42 (1st Cir. 2004) ..........................................................48

*Olim v. Wakinekona,*
  461 U.S. 238 (1983) .....................................................................51

*Palakovic v. Wetzel,*
  854 F.3d 209 (3d Cir. 2017) .........................................................33

*Palmer v. Johnson,*
  193 F.3d 346 (5th Cir. 1999) .......................................................35

*Parrish v. Johnson,*
  800 F.2d 600 (6th Cir. 1986) .......................................................35

*Perez v. Cox*,
    788 F. App'x 438 (9th Cir. 2019) ........................................39

*Perkins v. Kan. Dep't of Corr.*,
    165 F.3d 803 (10th Cir. 1999) ........................................34

*Poretti v. Dzurenda*,
    11 F.4th 1037 (9th Cir. 2021) ........................................45, 48

*Porter v. Clarke*,
    923 F.3d 348 (4th Cir. 2019) ........................................33

*Porter v. Pa. Dep't of Corr.*,
    974 F.3d 431 (3d Cir. 2020) ........................................33

*Quintanilla v. Bryson*,
    730 F. App'x 738 (11th Cir. 2018) ........................................32, 34

*Ratliff v. Dekalb County*,
    62 F.3d 338 (11th Cir. 1995) ........................................52

*Rivera v. Mathena*,
    795 F. App'x 169 (4th Cir. 2019) ........................................35

*Sentinel Tr. Co. v. Namer*,
    172 F.3d 873 (6th Cir. 1998) ........................................25

*Sheley v. Dugger*,
    833 F.2d 1420 (11th Cir. 1987) ........................................32

*Spain v. Procunier*,
    600 F.2d 189 (9th Cir. 1979) ........................................34

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ........................................18, 19, 23

*Sunseri v. Macro Cellular Partners*,
    412 F.3d 1247 (11th Cir. 2005) ........................................24

*Tannenbaum v. United States*,
    148 F.3d 1262 (11th Cir. 1998) ........................................43

*Thomas v. Bryant*,
  614 F.3d 1288 (11th Cir. 2010) ...................................................32, 41

*Transcontinental Gas Pipe Line v. 6.04 Acres*,
  910 F.3d 1130 (11th Cir. 2018) ...........................................................26

*United States v. Sec'y, Fla. Dep't of Corr.*,
  778 F.3d 1223 (11th Cir. 2015) ..................................................*passim*

*United States v. Zuanetti*,
  656 F. App'x 479 (11th Cir. 2016) .....................................................24

*Walker v. Mintzes*,
  771 F.2d 920 (6th Cir. 2016) ...............................................................34

*Wilson v. Seiter*,
  501 U.S. 294 (1991) ......................................................................33, 34

*Young v. Quinlan*,
  960 F.2d 351 (3d Cir. 1992) ................................................................33

**Statutes**

18 U.S.C. § 3626 .........................................................................................20

18 U.S.C. § 3626(a)(1)(A) ...............................................46, 47, 48, 49

18 U.S.C. § 3626(a)(1)(B)...................................................................49

18 U.S.C. § 3626(a)(2) .................................................................1, 19, 52

**Other Authorities**

Fla. Admin. Code 33-602.220(6)(f) ....................................................15

Fla. Admin. Code R. 33-404.103 ...........................................................6

Fla. Admin. Code R. 33-404.103(4)(15) ..............................................3

Fla. Admin. Code R. 33-601.800(10)(e)(1) .......................................35

## STATEMENT OF JURISDICTION

This Court lacks jurisdiction over this interlocutory appeal because the expiration of the preliminary injunction by operation of the PLRA, 18 U.S.C. § 3626(a)(2), has mooted the appeal and, thus, divested this Court of jurisdiction. *E.g.*, *Ga. Advoc. Off. v. Jackson*, 4 F.4th 1200, 1210-11, 1215 (11th Cir. 2001) (expiration of a preliminary injunction under the PLRA moots any appeal from the injunction and "oust[s] the [appellate] court of jurisdiction").

## STATEMENT OF THE ISSUES

William Melendez, an elderly, mentally ill prisoner, has spent nearly five years in solitary confinement. There, his already precarious mental health has declined, causing him to repeatedly attempt suicide and engage in acts of life-threatening, extreme self-mutilation. After Melendez was assessed to be at imminent risk of death by suicide or self-mutilation, the district court granted an emergency preliminary injunction, requiring a temporary transfer to one of several inpatient psychiatric facilities maintained by FDC. FDC has since returned Melendez to solitary confinement, and the preliminary injunction expired on January 4, 2022, pursuant to the 90-day limit under the PLRA. *See* 18 U.S.C. § 3626(a)(2).

The questions presented are:

1.  Whether this Court has jurisdiction over FDC's interlocutory appeal of a now-expired preliminary injunction.

And, if an exception to mootness vests this Court with jurisdiction, as FDC incorrectly posits:

2.      Assuming this Court excuses FDC's waiver, whether the district court abused its discretion in granting the preliminary injunction without holding an evidentiary hearing.

3.      Whether the district court abused its discretion in assessing the relevant equitable and PLRA factors.

## INTRODUCTION

*"I continue to hear a voice telling me: 'cut your neck, cut the vein in your neck.'"*

D.E. 204-1 ¶ 24 (Statement of William Melendez, October 15, 2021).

The evidence in this case paints a damning picture of FDC personnel utterly indifferent to their responsibility to provide conditions of confinement that pass constitutional muster. Responsible for preserving the health and safety of Melendez, a mentally ill prisoner with a propensity to attempt suicide and otherwise self-mutilate, FDC instead provided delivered prolonged solitary confinement that placed his life at risk.

Under the circumstances, the district court had no choice but to order FDC to temporarily transfer Melendez from solitary confinement to an inpatient psychiatric facility before his propensity to self-harm left him dead. FDC believes that the district court should have instead stood by while Melendez continued to self-

mutilate, yet it has failed to point to any legal error that called for a different outcome.

But this Court should not even review FDC's conduct or the district court's necessary injunction. As FDC now concedes, the preliminary injunction has expired by operation of the PLRA. This Court therefore lacks jurisdiction to consider the injunction and FDC's interlocutory appeal should be dismissed.

## STATEMENT OF THE CASE

### I.  Background Facts.

#### A.  Melendez Repeatedly Attempts Suicide And Engages In Life-Threating Self-Mutilation During His Five Years In Solitary Confinement.

Melendez, a 62-year-old mentally ill man, has spent 1,802 out of the past 1,946 days in solitary confinement, mostly at Florida State Prison ("FSP"). D.E. 171-1 at 19; D.E. 171-2 ¶¶ 5-7, 13, 15. For much of that time, Melendez has been assigned to CM I, FDC's most restrictive form of solitary confinement. Fla. Admin. Code R. 33-404.103(4)(15).

On most days at FSP, Melendez spends twenty-four hours confined to a small cell, measuring a few steps across. D.E. 171-2 ¶¶ 14-19. His window is covered by sheet metal, providing almost no visibility or sunlight. *Id.* ¶ 14. His door is solid steel. *Id.* ¶ 20.

Although Melendez is entitled to out-of-cell recreation, FDC routinely ignores his requests for it or concocts specious reasons to deny it. *Id.* ¶¶ 15-17, 20. In the past seven *years*, in fact, Melendez has been allowed out-of-cell recreation on only 20 out of 2,527 recorded days—i.e., averaging less than 3 times a *year*.[2] D.E. 225 at 16-17; D.E. 220-8. Further prolonging his uninterrupted time in his cell, officers deny Melendez showers for up to four weeks at a time, which on one occasion left him with a staph infection and persistent sores. D.E. 171-2 ¶¶ 18-19.

Melendez is forbidden from talking with other prisoners and permitted to call family no more than once a month. *Id.* ¶¶ 14, 26. His only property at FSP is a pillow, two blankets, books, a radio, and headphones. *Id.* ¶ 14. Before leaving his cell, Melendez is usually strip-searched. *Id*.

As is common, D.E. 171-1 at 8, these conditions have exacerbated Melendez's mental illness. He has attempted suicide at least five times and repeatedly self-mutilated by inserting metal objects into and around his veins and by swallowing metal shards. D.E. 190-1 at 5; D.E. 171-1 at 14-15; D.E. 171-2 ¶¶ 2, 8-10, 30, 39. Often, he does so in response to auditory hallucinations that command him to take his life. D.E. 171-1 at 14, 26-27; D.E. 171-2 ¶¶ 23, 25.

---

[2] Incredibly, Melendez received *no* recreation from November 2016, through June 2019. D.E. 225 at 17; D.E. 220-8.

During a 2016 psychiatric crisis, for example, Melendez attempted suicide by jamming a piece of metal into a vein. D.E. 171-2 ¶ 2. During another crisis in 2020, Melendez inserted metal into his arm, only to reopen the wound the next day, soak his cell in blood, and nearly lose consciousness. *Id.* ¶¶ 8-10. Hospital physicians described him as suicidal. D.E. 171-3 at 21. Much the same occurred in February 2021. D.E. 171-3 at 23.

When Melendez self-harms, FDC often responds with harsh discipline rather than psychiatric care. After a 2016 suicide attempt, for example, Melendez was charged with assault when he bled on officers. D.E. 171-2 ¶ 2, 6. As punishment, FDC placed him in solitary for nearly three years. D.E. 171-2 ¶ 2, 6. Similarly, FDC's officers responded to his July 2020 self-mutilation by assaulting him, leaving him with facial wounds, a black eye, and a puncture wound on his ankle.[3] D.E. 171-3 at 17; D.E. 171-5 at 23; D.E. 220-6; D.E. 220-7.

Other times, FDC simply ignores him. On August 15, 2021, for example, Melendez rammed two nails into his arm. D.E. 171-2 ¶ 30. On August 16, Melendez informed FDC that he had inserted nails into his arm. D.E. 171-2 ¶ 31. The following day, medical staff confirmed that the nails were there—and had caused an infection—but did not remove them. *Id.* ¶ 32. On August 19, with the nails still in

---

[3] Melendez was charged with assault, but the charges were overturned on appeal and expunged. D.E. 171-2 at ¶ 10-13.

his arm and his wounds festering, D.E. 171-2 ¶ 31-33, Melendez met with FDC personnel responsible for "ensuring access" to mental health care and reported auditory hallucinations. D.E. 187-2 ¶ 5; *see* Fla. Admin. Code R. 33-404.103. He was not provided any psychological treatment. D.E. 187-2 ¶ 5. On August 28, Melendez inserted a third nail into a vein in his wrist. D.E. 171-2 ¶¶ 34-35. Again, he was not given any psychological treatment. *Id*. ¶ 36. After pressure from Melendez's counsel, FDC eventually took Melendez to a hospital, where three nails were removed. D.E. 171-2 ¶ 33; D.E. 171-9 ¶ 7; D.E. 190-1 at 5-6. The wounds were sufficiently deep that one could not even be sutured, as a photograph, taken by counsel, shows. D.E. 171-8.



Even after this incident, FDC refused to recognize the seriousness of Melendez's mental-health problems. Melendez was discharged from the hospital

with a diagnosis of "Depression/mood disorder," "Pathological behavior," and "Self mutilation," and a recommendation for "serious psych evaluation." D.E. 190-1 at 16. But FDC did not conduct the "need[ed]" follow-up evaluation, nor did they transfer Melendez to an inpatient psychiatric facility or dispense psychiatric medication. D.E. 171-2 ¶¶ 36, 38-39.

Instead, FDC returned him to solitary confinement. There, he continued to self-injure. He tore the stitches from his wrist and attempted to reopen a vein. D.E. 171-1 ¶7-13; 171-2 ¶ 39. He swallowed sharpened metal in full view of correctional officers, who ignored him. D.E. 171-1 ¶ 7-13; 171-2 ¶ 39.

## B.    FDC's Preposterous Security Justifications.

Melendez does not pose a serious security risk. D.E. 171 at 9-10; D.E. 187-3 ¶ 19; D.E. 225 at 23-26. Correctional staff rated Melendez's risk as "mild." D.E. 171-6 at 5 (scoring 6 on a scale of 1-60, with >60 being "very severe" risk, and 1–14 being "mild" risk); *see also id.* at 3-5. Notably, Melendez is not robust—when he arrived in FDC, he used a walker, but FDC confiscated it, making it difficult for him to get around. D.E. 171-2 ¶ 15.

After the preliminary injunction issued, FDC justified its treatment of Melendez based on a purported "long history of assaults on staff and others" and "other reasons" that go unelaborated. SB24. But what FDC characterizes as

Melendez's "long history of assaults" amounts to exaggerated and decontextualized descriptions of mental health crises:

- **2013:** Melendez was charged with "three separate charges of attempted assault on Staff," D.E. 184 at 3, for throwing a towel and a cup of water at his cell door after officers twice deployed chemical agent into Melendez's cell, including in response to his attempt to swallow a razor blade. D.E. 220-5, log nos. 120-131104, 120-131105, 120-131106, 120-131107, 120-131108.

- **2016**: Melendez was charged with "aggravated battery or attempted battery" for bleeding on an officer after Melendez cut a vein. D.E. 220-5, log no. 185-161000.

- **2020**: After a suicide attempt, FDC personnel brought Melendez back to consciousness by holding an ammonia stick to his nose. Upon regaining consciousness, Melendez allegedly grabbed an officer around the throat. D.E. 171 at 7-8; D.E. 225 at 25. After Melendez was released back to FDC from involuntary psychiatric hold in an outside hospital, he was charged with assault on staff, although the charges were later expunged. D.E. 171-2 at ¶ 10-13; D.E. 171-3 at 20; D.E. 171 at 6-7; D.E. 225 at 25.

Melendez's remaining disciplinary record, penalties for essentially minor misconduct predictable of a mentally ill person held in solitary confinement, further undermines the argument that he is a security risk. For example, Melendez was charged six times for cursing or rudeness to staff; eleven times for not following an order, including not sitting up on his bunk, not moving away from the food slot, or not moving his property; twelve times for yelling, waving his arms, or kicking the door of his cell; four times for alleged mail violations (Melendez had mistakenly

labeled letters to his brother, who works in law enforcement, as legal mail); and one time for having toilet paper wedged under his door. D.E. 225 at 26; D.E. 220-5.

Finally, it bears noting that, in the three months since Melendez was transferred out of CM pursuant to the preliminary injunction order, he has not had any disciplinary issues. *E.g.*, D.E. 225-1 at 47 ("no security issues at this time"); *id.* at 49 ("His participation in services has been excellent."); D.E. 220-2 ¶ 13 (no security issues). In FDC's inpatient psychiatric facilities, he was compliant with his treatment plan and consistently attended mental health groups. D.E. 225-1 at 47. Every nurse who had contact with him described him as "cooperative." *Id.* at 4, 16, 18, 20, 22, 24.

## C. The District Court Orders Melendez Transferred To An Inpatient Psychiatric Facility.

On September 15, after Melendez inserted three nails into his arm, Dr. Terry Kupers, M.D., a board-certified psychiatrist and distinguished fellow of the American Psychiatric Association, conducted his second thorough evaluation of Melendez. D.E. 171-1 at 2-3; D.E. 187-1 ¶ 3. In a report detailing his views, Kupers diagnosed Melendez with a "serious mental illness"—"major depressive disorder with psychotic features." D.E. 171-1 at 20. Kupers opined that Melendez was at "extremely high risk" of death by self-harm. *Id*. at 13-15, 20-21, 30-32. According to Kupers, Melendez needed "release[] from solitary confinement and transfer[] to a carceral setting where the conditions of confinement are much less damaging to his

mental health and where adequate mental health treatment is available." *Id.* at 29.

"[S]olitary confinement," by contrast, "greatly increase[d] the risk of suicide," in

Kupers' opinion. *Id.* at 30-31.

FDC received Kupers' report but did not remove Melendez from solitary,

transfer him to inpatient psychiatric care, or even prescribe psychiatric medication.

D.E. 171-9 ¶ 9; D.E. 171-2 ¶ 38. Following this inaction, Melendez filed an

emergency motion for a preliminary injunction compelling FDC to provide him

psychiatric treatment in one of the inpatient psychiatric units it maintains. D.E. 171,

175. Melendez sought an evidentiary hearing, D.E. 171, 175, and submitted over

200 pages of evidence, including:

- Kupers' reports detailing Melendez's medical and psychiatric history and pattern of self-harm; describing scientific research on solitary; affirming Melendez's need for inpatient care; and emphasizing that Melendez's self-harm was life-threatening, D.E. 171-1; D.E. 187-1;

- Declarations from Melendez, attesting to the conditions of his confinement; describing his history of taking antipsychotics (which FDC discontinued), self-mutilating, and hearing hallucinations commanding self-mutilation; stating that mental health staff have dismissed his hallucinations as just "his conscience"; and asserting that he will die without psychiatric intervention, D.E. 171-2; D.E. 187-2;

- FDC medical, incident, and investigatory records documenting Melendez's self-harm, D.E. 171-3; D.E. 171-4; D.E. 171-5;

- Various disciplinary and classification records, D.E. 171-6; and

- A declaration from veteran correctional administrator Dan Pacholke, opining that "it is clear that CM is not appropriate housing for Mr. Melendez," and that he should be in a mental health unit instead, D.E. 187-3 ¶ 26.

FDC did not respond to Melendez's motion and did not request an evidentiary hearing. Nonetheless, the district court ordered a response, set a hearing, and denied Melendez's request for an evidentiary hearing without prejudice, but indicated it would reconsider the request if, after FDC's response, "it appears the facts are bitterly disputed or credibility determinations must be made." D.E. 176 at 3. In opposition, FDC submitted the following evidence:

- An affidavit from Assistant Warden McClellan summarizing Melendez's disciplinary history and CM classification, with Melendez's disciplinary records attached, D.E. 181-1;

- Records listing FDC's reviews of Melendez's placement in solitary confinement, D.E. 186-1;

- A request for judicial notice of an expert report from another case, D.E. 188; and

- A report from FDC's mental health director George Emanoilidis, a clinical psychologist. D.E. 182-1. Emanoilidis "did not personally evaluate [Melendez]," but based his report on "several personal interactions," and his review of "various medical records," including a near year-old evaluation completed by a different provider, D.E. 182-1 at 2, 5; RM11.[4]

The court carefully reviewed this evidence before the preliminary injunction hearing, invited the parties to "amplify" the record "through argument," and imposed

---

[4] Emanoilidis acknowledged Melendez's five prior suicide attempts and acts of "self-harm," including "swallowing a razor," "cutting self," and "placing metal in arm," but asserted Melendez did not need psychiatric medication or a "higher level of mental health care." D.E. 182-1 at 5-7.

no time limitation. PO.Ex.1 at 6. The parties described the record with particularity. *Id*. at 4-61. For example, FDC's counsel presented its evidence and argued that: "repeated self-mutilation is not evidence of a serious mental illness"; Melendez "engage[s] in self-harm for secondary purposes"; and Melendez would be "cutting his throat" or "slitting his wrists" if he were suicidal. *Id*. at 28-29, 45. By contrast, Melendez's counsel proffered evidence that it is official FDC policy to consider comparatively benign acts—"scratching wrist with a paper clip or plastic knife"— as "suicidal gesture[s]." *Id.* at 54; D.E. 171-3 at 6.

After the hearing, the court announced preliminary findings: (1) Melendez was likely to prevail on his Eighth Amendment claim; (2) Melendez had shown a risk of irreparable harm, specifically death; (3) Melendez's transfer to any of the mental health units within FDC presented "miniscule" harm to Defendants; and (4) "adequate treatment of mentally ill people" in custody is in the public interest. *Id*. at 55-56.

In an endorsed order, the court directed that FDC (1) transfer Melendez to "a suitable mental health unit for inpatient psychiatric treatment" until "a qualified, licensed mental health provider at the transferee institution determines [Melendez] is medically and psychologically capable of returning to the general population" and (2) "video record all of [Melendez's] interactions with staff on account of [Melendez's] physical or mental health or problematic behavior and transportation

until [Melendez] is transferred to an inpatient psychiatric facility and upon his return therefrom until further order." D.E. 189. The district court then issued a twenty-four-page written order detailing the scope of the preliminary injunction. Across seventeen pages, the court cited, described, and offered particularized analysis of the parties' evidence and addressed the parties' arguments. D.E. 203 at 7-22.

First, the court found that Melendez "met his burden" on the "equitable considerations" necessary to obtain a preliminary injunction. *Id*. at 2-3. The court found that Melendez had spent five years in unusually harsh conditions unjustified by penological necessity and that solitary confinement was contributing to his life-threatening behavior. *Id*. at 9-19. It also found that Melendez was likely to prevail on the merits because FDC personnel were aware that solitary confinement was causing Melendez to self-mutilate and attempt suicide, yet did little to ameliorate this situation. *Id*. at 19-21. Finally, the court found that: Melendez is at significant risk of death, the ultimate "irreparable injury"; "the impact on the FDOC is minor given [it] already maintains correctional facilities equipped to treat mentally ill prisoners"; and appropriate care for mentally ill prisoners is in the public interest. *Id*. at 22-23.

Second, the court analyzed the PLRA's additional limits on injunctive relief—that it be narrowly drawn, extend no further than necessary, and be the least intrusive means of remediating the harm. *Id*. at 2-3. Based on the record, the court found that

its ordered relief is "a minor intrusion into the [FDC's] management of its prisons," accounts for the "risk of harm [Melendez] faced if he remained in CMI status at FSP," and reflects an appropriate balance between "deference to prison administrators" and the "convincing evidence" that Melendez's "constitutional rights likely are being infringed." *Id*. at 22-23.

### D. FDC Fast-Tracks Melendez Through Inpatient Psychiatric Care And Returns Him To Solitary Confinement.

On October 8, FDC transferred Melendez to an inpatient psychiatric unit. D.E. 201. Melendez reported serious symptoms of mental illness throughout his inpatient stay, including on his first day there, when he told the intake nurse he was "suicidal due to voices telling him to kill himself." D.E. 225-1 at 4-6. He repeatedly reported anxiety and depression, *e.g.*, *id.* at 11, 16, 18, 20, 22, 24, and hearing voices telling him to kill himself, *e.g.*, *id.* at 16, 18, 20, 22, 24, 28-29. He explained that he often argues with the voices, and believes he is hearing the devil. *E.g.*, *id.* at 16, 22, 28-29.

FDC mental health staff knew of multiple documented instances of Melendez's self-harm, admissions to inpatient mental health care, prescriptions for antipsychotic medication, and his recent hospitalization for "inserting metal nails into veins." *Id.* at 30-31. Melendez's Individualized Service Plan identified his primary problem as "Abusive to Self," specifically: "Swallows objects, cuts self,

bites self, bangs head, chokes self, jumps from heights, tears sutures, etc. [Melendez] has a [history] of cutting, and inserting objects into his person." *Id.* at 33.

Nonetheless, FDC mental health staff routinely downplayed his symptoms and self-reports. More than once, they incorrectly reported that Melendez denied hallucinations. *E.g.*, *id.* at 26. They also frequently omitted his history of self-harm on medical forms that expressly called for such information. *E.g.*, *id.* at 27, 29. Even when staff noted symptoms, they illogically dismissed them and their significance. *E.g.*, *id.* at 16, 18, 20, 28-29 (recording that Melendez reported hearing voices "telling him to hurt himself," yet marking suicidality and self-injury as "None" because he "has not been Observed responding to internal stimuli, and is unable to identify if voice is male or female"). Exemplifying this dismissive attitude, Dr. Johnathan Greenfield, FDC's associate statewide psychiatric director, discontinued Melendez's suicide observation status without prescribing any psychiatric medication or scheduling him for a follow-up evaluation. D.E. 202-1 at 8; D.E. 204.

Consistent with FDC's ongoing refusal to recognize Melendez's serious mental health needs, FDC housed Melendez in the mental health unit for only thirty-two days before moving him to "administrative confinement," a form of solitary confinement, where he remains today.[5] D.E. 220-2 ¶¶ 14-15. Outside his door is a

---

[5] FDC regulations describe "administrative confinement" as solitary confinement for non-disciplinary purposes. Fla. Admin. Code 33-602.220(6)(f).

sign that reads: "CM I" and "house alone." *Id.* ¶ 16. His current conditions of confinement are essentially indistinguishable from the conditions he endured at FSP, from which the Court ordered him transferred. *See* D.E. 220-2.

## II. Procedural History

Melendez filed the operative complaint in July 2021, alleging that his solitary confinement violated the Eighth and Fourteenth Amendments as well as the Americans with Disabilities Act. D.E. 1; D.E. 134.

After the preliminary injunction order was issued, FDC filed an emergency motion to stay, which was denied by the district court. D.E. 195; D.E. 197. FDC then filed an emergency stay motion in this Court, which was denied, as was FDC's subsequent motion for reconsideration.

On January 4, 2022, the preliminary injunction at issue on appeal expired by operation of law.[6]

---

[6] On January 3, 2022, Melendez moved for another emergency preliminary injunction, as well as a temporary restraining order, in the district court. D.E. 220. Therein, Melendez requested that FDC return him to one of its inpatient psychiatric facilities; appoint an independent expert to opine as to his mental health needs and appropriate placement; and prohibit FDC from returning Melendez to solitary confinement upon discharge from an inpatient facility. *Id.* at 1-2. The motion remains pending, although the district court has set an evidentiary hearing for January 20, 2022. D.E. 230.

## STANDARD OF REVIEW

This Court reviews questions of mootness and jurisdiction de novo. *Jones v. Governor of Fla.*, 950 F.3d 795, 806 (11th Cir. 2020). Mootness aside, this Court's "review of a district court's decision to grant or deny a preliminary injunction is extremely narrow in scope." *Id.* (citing *Carillon Imps., Ltd. v. Frank Pesce Int'l Grp., Ltd.*, 112 F.3d 1125, 1126 (11th Cir. 1997)). It reviews the issuance of a preliminary injunction under the deferential abuse-of-discretion standard, reviewing legal issues *de novo* and factual issues for clear error. *Id.*

## SUMMARY OF ARGUMENT

**I.** The expiration of a preliminary injunction under the PLRA moots any appeal from the injunction and ousts the appellate court of jurisdiction. The preliminary injunction at issue here has expired, so the appeal is moot. The district court's alleged errors are not capable of repetition yet evading review because (a) Melendez's new motion for preliminary injunction does not seek the same relief as ordered in the first injunction, (b) the district court's disposition of the new motion is unlikely to implicate the same alleged procedural errors that FDC challenges here, and (c) even if a new injunction were identical in all respects, it would not evade review.

**II.** Mootness aside, FDC's arguments fail on the merits.

**A.** The district court did not err by ordering relief without holding an evidentiary hearing and taking live testimony. First, FDC never requested an evidentiary hearing below, so that argument is waived. Second, the district court took evidence and heard argument before granting relief; nothing more was required. Finally, an evidentiary hearing was unnecessary because FDC failed to demonstrate a bitter dispute of fact.

**B.** The district court properly found that Melendez satisfied the four-part injunction test: (a) his Eighth Amendment conditions-of-confinement claim is likely to succeed because FDC held him in prolonged solitary confinement and deprived him of exercise and sanitation; (b) he faces the irreparable harm of death; (c) the balance of harms tips in his favor because he may die while the burden on FDC is minimal; and (d) the public interest is served by protecting constitutional rights and encouraging rehabilitation.

**C.** The district court properly found, under the PLRA, that its ordered relief was necessary, narrowly tailored, and the least intrusive remedy available.

**D.** FDC's remaining arguments are frivolous.

## ARGUMENT

### I.    This Court Lacks Jurisdiction To Review This Moot Appeal.

In any appeal, "the first and fundamental question is that of jurisdiction." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998); *United States v. Sec'y,*

*Fla. Dep't of Corr.*, 778 F.3d 1223, 1226-27 (11th Cir. 2015) ("We must address [mootness] at the outset because we have no jurisdiction to decide moot questions."). When jurisdiction "ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Steel Co.*, 523 U.S. at 94.

The "lifespan" of a "preliminary injunction under the PLRA" is "predetermined" by federal statute—namely 18 U.S.C. § 3626(a)(2), which governs prospective relief in prisoner cases. *Ga. Advoc. Off.*, 4 F.4th at 1209. Under that statute, a preliminary injunction "automatically expire[s] 90 days after its entry" unless a permanent injunction is entered. *Id.* (citing 18 U.S.C. § 3626(a)(2)).

As FDC concedes, the preliminary injunction entered on October 6, 2021 was not converted into a permanent injunction, so it "expire[d] by operation of law on January 4, 2022"—90 days later. OB47. Once the 90-day period expires, the preliminary injunction "passe[s] on to injunction heaven" and any "appeal is moot." *Sec'y, Fla. Dep't of Corr.*, 778 F.3d at 1228-29; *see Ga. Advoc. Off.*, 4 F.4th at 1215 ("[W]hen a preliminary injunction expires by operation of law under § 3626(a)(2), any appeal from that injunction is moot.").[7] And as this Court has held repeatedly,

---

[7] Other circuits hold similarly. *E.g.*, *Edmo v. Corizon, Inc.*, 935 F.3d 757, 782 (9th Cir. 2019) ("Generally, the expiration of an injunction challenged on appeal moots the appeal."); *Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Ins. Co.*, 714 F.3d 424, 429 (6th Cir. 2013) ("Because the preliminary injunction here expired by its terms . . . a challenge to its issuance is moot unless a recognized exception applies.").

the "automatic expiration" of the preliminary injunction, by "mooting the appeal," "oust[s] the court of jurisdiction." *Ga. Advoc. Off.*, 4 F.4th at 1210; *Sec'y, Fla. Dep't of Corr.*, 778 F.3d at 1227 (same).

FDC, faced with this rule and its clear application to this case, nonetheless argues that this Court retains jurisdiction because this case is purportedly "capable of repetition, yet evading review." OB48. But that exception is narrow and "applies only in exceptional situations." *City of L.A. v. Lyons*, 461 U.S. 95, 109 (1983). To satisfy it, FDC must show that "(1) there [is] a reasonable expectation or a demonstrated probability that the same controversy will recur involving the same complaining party, and (2) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration." *Sec'y, Fla. Dep't of Corr.*, 778 F.3d at 1229. FDC can make neither showing.

On the first prong, FDC makes two arguments. FDC first argues that there is a "distinct probability . . . that the same controversy will recur" because Melendez may someday seek the "very same" relief. OB 48-49. FDC next argues, in essence, that because all preliminary injunctions entered under the PLRA expire after 90 days, any subsequent preliminary injunction would necessarily evade review.[8] *See* OB 48-50. Both arguments have been roundly rejected by this Court.

---

[8] FDC also predicts that "any subsequent injunction would evade review" because the district court has purportedly shown that it "intends" to flout the clear 90-day expiration language of 18 U.S.C. § 3626. OB50. Disregarding the bizarre suggestion

To start, while Melendez has moved for another preliminary injunction, that motion requests relief distinct from the relief granted in the preliminary injunction under review. *See supra* at 11, 18 n.6. Thus, Melendez is not seeking the "very same" prospective relief that will purportedly evade review in perpetuity. *Christian Coal. of Fla., Inc. v. United States*, 662 F.3d 1182, 1196 (11th Cir. 2011) (issue not capable of repetition where "hypothetical future controversy advanced by [FDC] would be at most a *similar* one"). Under such circumstances, there can be no "reasonable expectation or a demonstrated probability that the same controversy will recur." *Sec'y, Fla. Dep't of Corr.*, 778 F.3d at 1229. And even if Melendez had moved for the same preliminary injunctive relief, it is, at this stage, impossible to predict whether the district court would again grant his motion. *See Ga. Advoc. Off.*, 4 F.4th at 1216.

On top of these defects in FDC's argument, FDC ignores that the "same controversy" is not likely to recur because many of FDC's arguments against the injunction turn on procedural grounds specific to this particular order. *E.g.*, OB14

---

that Judge Davis is a rogue actor, such an argument *undermines* FDC's evade-review argument. If, as FDC argues, Judge Davis means for any subsequent "preliminary injunction to remain in place until trial, regardless of whether the preliminary injunction expires or not," OB50, this Court would have more, not less, time to review it. In any case, this Court has repeatedly rejected evade-review arguments that are predicated on predictions of future error by a district judge. *E.g.*, *Sec'y, Fla. Dep't of Corr.*, 778 F.3d at 1229.

(arguing district court erred in not holding evidentiary hearing); *id.* at 22 (arguing district court erred in purportedly granting relief Melendez did not request); *id.* at 24-25 (arguing district court failed to make required findings under PLRA). But the district court is by no means certain to make any of the purported procedural errors FDC raises if and when it issues a second preliminary injunction. *See Sec'y Fla. Dep't of Corr.*, 778 F.3d at 1229.

Indeed, FDC's principal worry—that the district court would once again proceed without an evidentiary hearing—is practically guaranteed not to come to pass because the district court has *already* set an evidentiary hearing. D.E. 230. Likewise, "there is no basis for [this Court] to predict that if [Melendez] seeks a new preliminary injunction, the district court (assuming it grants the motion) will decline to make the required need-narrowness-intrusiveness findings." *See Sec'y Fla. Dep't of Corr.*, 778 F.3d at 1229.

On the second prong, no subsequent preliminary injunction—even one that, implausibly, implicated the "same controversy" rather than a merely "similar" controversy—evade review. This Court has repeatedly rejected the argument that the mootness exception applies to PLRA preliminary injunction appeals because of a purported risk that "the district court might enter another preliminary injunction without . . . making the order final within 90 days." *Ga. Advoc. Off.*, 4 F.4th at 1216; *Sec'y, Fla. Dep't of Corr.*, 778 F.3d at 1229 (similar). As a matter of law, there is

simply "'no reasonable expectation' that any new preliminary injunction would expire before it reached this Court on appeal." *Sec'y, Fla. Dep't of Corr.*, 778 F.3d at 1229. Rather, there is every expectation that, if the district court were to issue another preliminary injunction, FDC could "obtain review" when it was converted to a permanent injunction or after "final judgment." *Ga. Advoc. Off.*, 4 F.4th at 1216.

That is, of course, "assuming [Melendez] succeed[s]" in securing it at all. *Id.* And that uncertainty emphasizes the overarching problem with FDC's jurisdictional arguments, all of which are predicated upon conjecture. But "[t]he remote possibility that an event might recur is not enough to overcome mootness." *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1336 (11th Cir. 2001). Indeed, "even a likely recurrence is insufficient if there would be ample opportunity for review at that time." *Id.* Ultimately, FDC requests an advisory opinion on a preliminary injunction that has evaporated by operation of law and no longer binds it. FDC's wish disregards jurisdictional reality. The proper recourse is to "announc[e] the fact and dismiss[] the cause." *Steel Co.*, 523 U.S. at 94.

## II. In The Alternative, The District Court Did Not Abuse Its Discretion In Ordering A Preliminary Injunction Necessary To Preserve Melendez's Life.

### A. The District Court Exercised Appropriate Discretion In Declining To Hold An Evidentiary Hearing.

Assuming this case is not moot, FDC first argues that the district court erred in granting relief to Melendez without taking live testimony, OB14-22, but that

argument falls flat. As an initial matter, FDC did not even request an evidentiary hearing prior to the preliminary-injunction hearing, but now insists before this Court that the district court erred by failing to hold one. That belated argument is waived. *See Bryant v. Jones*, 575 F.3d 1281, 1296 (11th Cir. 2009). This Court "turn[s] a deaf ear to protests that an evidentiary hearing should have been convened but was not, where . . . the protestor did not seasonably request such a hearing in lower court." *Sunseri v. Macro Cellular Partners*, 412 F.3d 1247, 1250 (11th Cir. 2005). This Court has reaffirmed this rule at least five times since establishing it in *Sunseri*. *See Baker v. Bank of Am., N.A.*, 837 F. App'x 754, 762 (11th Cir. 2020); *Ffrench v. Ffrench*, 781 F. App'x 930, 933 n.2 (11th Cir. 2019); *United States v. Zuanetti*, 656 F. App'x 479, 479 n.1 (11th Cir. 2016); *Molina v. Aurora Loan Servs., LLC*, 635 F. App'x 618, 627 (11th Cir. 2015); *Hardy v. Broward Cnty. Sheriff's Off.*, 238 F. App'x 435, 443 (11th Cir. 2007). Because FDC gives no reason to deviate from that established rule here, its evidentiary-hearing argument is waived.

Regardless, FDC's argument fails on the merits. Not only did the district court hold a robust hearing at which both parties had ample opportunity to make their case, but none of the core facts were in dispute such that the district court's decision hinged on credibility determinations.

To start, a hearing on a preliminary-injunction motion need only afford the parties an opportunity to present evidence and arguments to "educate the court

regarding the complex issues involved in the case." *Fed. Trade Comm'n v. Vylah Tec, LLC*, 727 F. App'x 998, 1001 (11th Cir. 2018). Here, those parameters were met. After giving the parties time to prepare and gather evidence, D.E. 176, the district court held an extended hearing at which the parties were afforded the opportunity to introduce evidence and presented argument with no time limitations, PO.Ex.1 at 4-61.

FDC nonetheless asserts that the court needed live testimony to conclude that Melendez faced a risk of imminent harm. But live testimony is not required to grant preliminary injunctions, which are instead "customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Sentinel Tr. Co. v. Namer*, 172 F.3d 873 (6th Cir. 1998); *Vylah Tec, LLC*, 727 F. App'x at 1001 ("To the extent Appellants contend the district court should have required Appellees to present live testimony, they have not provided, nor have we found, any binding authority to that effect.").

Regardless, an evidentiary hearing is only required when the facts are "bitterly contested" or credibility determinations are critical. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1312-13 (11th Cir. 1998). Facts are bitterly contested "[w]here conflicting factual information 'place[s] in serious dispute issues central to [a party's] claims.'" *Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1211 (11th Cir. 2003). Asserting a dispute is not enough; the opposing

party must make a preliminary showing that there is a serious dispute that warrants an evidentiary hearing. *Transcontinental Gas Pipe Line v. 6.04 Acres*, 910 F.3d 1130, 1170-71 (11th Cir. 2018). Here, the pertinent facts were not in "sharp dispute[] such that the propriety of injunctive relief hinge[d] on determinations of credibility," so an evidentiary hearing was not necessary. *McDonald's Corp.*, 147 F.3d at 1312.

The district court found no serious dispute regarding the following material facts: (1) Melendez has a mental illness; (2) he has a history of self-injury; (3) he had recently been admitted to a hospital for surgical removal of foreign bodies; (4) he is not receiving psychotropic medication; (5) Emanoilidis did not personally examine Melendez when preparing his report; (6) Emanoilidis' opinion of Melendez's mental health is based primarily on a December 2020 evaluation performed by another provider; and (7) Melendez is in solitary confinement on overturned charges. D.E. 197 at 2-3. Despite ample opportunity—including the district court's explicit invitation—to introduce evidence of a bitterly disputed fact in its response to Melendez's motion, D.E. 176, FDC could not.

FDC disagrees, mostly reprising arguments that it has already presented to this Court. FDC points to five allegedly disputed facts: Melendez's precise mental-health diagnosis; whether Melendez is actively suicidal; the validity of expert Dan Pacholke's opinion; whether defendants behaved wantonly; and whether Melendez

received the privileges to which he was entitled in solitary confinement. These do not constitute bitter disputes.

First, FDC believes that Kupers' and Emanoilidis' differing diagnoses evince a bitter dispute of fact.[9] OB15-19. But FDC misunderstands the district court's analysis. Specifically, not once did the district court say that it found Emanoilidis lacking in credibility; it concluded merely that Emanoilidis' opinion did not contradict Kupers' opinion that CM was *presently* dangerous for Melendez. Kupers' opinion, the court correctly noted, was based on an evaluation of Melendez's present mental and physical state; Emanoilidis' opinion, by contrast, was based on less recent and less extensive contacts and on his review of year-old and otherwise unspecified records. D.E. 197 at 2-3; D.E. 203 at 14. Moreover, Kupers' assessment was echoed by physicians at Memorial Hospital who recently treated Melendez after he inserted nails into his arm. D.E. 171-2 ¶ 30; D.E. 190-1 at 16.

FDC also urges that there is a bitter dispute of fact over whether Melendez is actively suicidal, or if his acts of self-harm are instead attributable to secondary gain. OB16. Notably, Melendez's desperation to escape CM, and FDC personnel who have disregarded his well-being, is consistent with his mental illness—as Kupers

---

[9] This alleged dispute purportedly turns on the clinically meaningless distinction that Kupers diagnosed Melendez with a "serious mental illness," D.E. 171-1 at 20, while FDC diagnosed Melendez with mere "mental illness," SM13.

opined, Melendez fears that he "will never be released [from FSP], rather he believes he will die from beatings by custody staff." D.E. 171-1 at 20.

In short, there is no serious dispute that Melendez engages in life-threatening self-mutilation. And whatever the reason for Melendez's propensity to self-mutilate—a propensity FDC concedes, D.E. 161 ¶ 3—the fact that he has not yet "cut[] his throat" or "slit[] his writs," PO.Ex.1 at 45:15-16, does not guarantee that his self-mutilation will not be deadly, *id.*; D.E. 187-3 ¶ 26. In fact, as Kupers explained: "[P]eople die from self-harm that is not consciously a suicide attempt." D.E. 187-1 at 5. The district court did not need to hear live testimony from anyone to find that Melendez's life was in grave danger from repeated self-harm and that he required transfer to a mental-health unit.

FDC also takes issue with the district court's reference to the declaration of Dan Pacholke, an expert in penology, without subjecting him to cross-examination. OB17. But FDC had a chance to challenge Pacholke's report during the preliminary-injunction proceedings. FDC chose not to. Anyhow, if FDC could actually rebut Pacholke's opinion by explaining why Melendez, a 62-year-old man who used a walker until FDC confiscated it, D.E. 171-2 at ¶ 15, and whom FDC itself ranks a 6 on its 60-point risk scale, is among the "'worst of the worst,' or is so dangerous as to require the strictures of solitary confinement," D.E. 187-3 at 10, it could have done so by now. That failure is not attributable to the lack of live testimony from

Pacholke—FDC does not even speculate as to how cross-examining Pacholke could have impacted the analysis.

Next, FDC suggests an evidentiary hearing was necessary for it to show that it was not deliberately indifferent. But FDC has not explained what evidence it would have submitted to support that contention—and it is difficult to imagine what that evidence might entail in light of the record. After all, Melendez introduced evidence that, knowing he is mentally ill, FDC consigned him to years in solitary confinement in conditions that have caused him to seriously self-mutilate. D.E. 171 at 13-15; D.E. 171-2 ¶ 2, 10. And, rather than help him after each of these self-mutilation incidents, FDC continued to subject him to the very conditions that provoked them. D.E. 171-2 ¶7-13. That conduct constitutes quintessential deliberate indifference. *E.g.*, *Farmer v. Brennan*, 511 U.S. 825, 843-44 (1994).

Finally, FDC suggests it needed an evidentiary hearing to demonstrate that Melendez was not denied certain "privileges"—"meals, educational opportunities, religious services, [and] showers." OB 21-22. But Melendez introduced evidence that he goes weeks without showers. D.E. 171-2 ¶¶ 18-19. And, despite ample opportunity—in their response to the preliminary injunction motion or at the hearing at which the they were not limited in the time they had to argue—FDC did not rebut the evidence of that or any other deprivation. Nor has it explained how live testimony

could have helped. FDC cannot now complain that its own failings were the fault of the district court.

Ultimately, FDC failed, despite ample opportunity, to make a compelling record of materially disputed facts. The district court recognized as much when it denied FDC's motion to stay: "Defendants were afforded an opportunity to present evidence to rebut [Melendez's] evidence showing he is in imminent need of psychiatric intervention to prevent his suicide. They failed to do so." D.E. 197 at 3.

One final point: contrary to FDC's view that this Court should scrutinize the district court's factfinding for purported but ultimately illusory "bitterly disputed fact," deference to the district court is particularly appropriate on review of a preliminary injunction. As this Court has explained:

> Preliminary injunctions are, by their nature, products of an expedited process often based upon an underdeveloped and incomplete evidentiary record. As is usually the case, the trial court is in a far better position than this Court to evaluate that evidence, and we will not disturb its factual findings unless they are clearly erroneous. The expedited nature of preliminary injunction proceedings often creates not only limits on the evidence available but also pressure to make difficult judgments without the luxury of abundant time for reflection. Those judgments, about the viability of a plaintiff's claims and the balancing of equities and the public interest, are the district court's to make and we will not set them aside unless the district court has abused its discretion in making them.

*Cumulus Media, Inc. v. Clear Channel Comms., Inc.*, 304 F.3d 1167, 1171 (11th Cir. 2002) (citations omitted); *see BellSouth Telecommunications, Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 968 (11th Cir. 2005) ("We begin

our review by noting how deferential it is."); *Brown v. Plata*, 563 U.S. 493 (2011) (similar); *Jones*, 950 F.3d at 828 (similar). This customary deference to the district court is appropriate here.

### B.    The District Court's Order Complied With The Preliminary-Injunction Standard.

The district court's order satisfied the four-part preliminary injunction test, which requires a plaintiff to demonstrate that "(1) [he] has a substantial likelihood of success on the merits; (2) [he] will suffer an irreparable injury unless the injunction is granted; (3) the harm from the threatened injury outweighs the harm the injunction would cause the opposing party; and (4) the injunction would not be adverse to the public interest." *Gonzales v. Governor of Ga.*, 978 F.3d 1266, 1271 (11th Cir. 2020) (footnote omitted).

### 1.    Melendez Is Likely To Succeed On His Eighth Amendment Claims.

The Eighth Amendment prohibits cruel and unusual punishment. *Farmer*, 511 U.S. at 832. Prison officials violate the Eighth Amendment when they are both objectively and subjectively culpable. *Id*. at 834. The "objective component" of this test asks whether prison conditions "pose an unreasonable risk of serious damage to [a prisoner's] future health" or safety, *Helling v. McKinney*, 509 U.S. 25, 30, 35 (1993), or deny him "the minimal civilized measure of life's necessities," *Farmer*, 511 U.S. at 834 (citation omitted); *see also Chandler v. Crosby*, 379 F.3d 1278, 1289

(11th Cir. 2004). "[M]ental health needs are no less serious than physical needs" for Eighth Amendment purposes. *Thomas v. Bryant*, 614 F.3d 1288, 1312 (11th Cir. 2010) (citation omitted). The "subjective component" asks whether prison officials showed "deliberate indifference to inmate health or safety," i.e., that they knew of and disregarded an excessive risk to health or safety. *Farmer*, 511 U.S. at 834 (internal quotation marks and citation omitted).

### a. Melendez's Prolonged Solitary Confinement Deprives Him Of Basic Necessities And Poses An Unreasonable Risk Of Harm.

Melendez is likely to succeed in showing that FDC violated the Eighth Amendment in several ways: by subjecting him to prolonged solitary confinement notwithstanding the extreme harm it imposes upon him; by subjecting him to prolonged solitary confinement without penological necessity; and by depriving him of exercise and sanitation.

To begin with, FDC's prolonged solitary confinement of Melendez, notwithstanding his mental illness, has caused him extreme psychological harm and raises an intolerable risk that he will commit suicide or otherwise self-harm. As this Court has recognized, "confinement in an isolation cell is a form of punishment subject to scrutiny under Eighth Amendment standards." *Quintanilla v. Bryson*, 730 F. App'x 738, 746 (11th Cir. 2018) (quoting *Hutto v. Finney*, 437 U.S. 678, 685 (1978)) (alterations omitted). Thus, while solitary confinement is not a per se Eighth

Amendment violation, this Court has made clear that *prolonged* solitary confinement "raises serious constitutional questions." *Sheley v. Dugger*, 833 F.2d 1420, 1429 (11th Cir. 1987). Going further, at least two circuits have squarely held that prolonged solitary confinement, standing alone, violates the Eighth Amendment. *Porter v. Pa. Dep't of Corr.*, 974 F.3d 431, 447 (3d Cir. 2020)*; Porter v. Clarke*, 923 F.3d 348, 364 (4th Cir. 2019). And this Court need not go so far—every circuit to consider the question has held that the prolonged solitary confinement of mentally ill prisoners raises serious Eighth Amendment concerns, at least where, as here, the conditions cause severe physical and psychological harm. *Disability Rights Montana, Inc. v. Batista*, 930 F.3d 1090, 1098-99 (9th Cir. 2019); *Finley v. Huss*, 723 F. App'x 294, 295-96 (6th Cir. 2018); *Palakovic v. Wetzel*, 854 F.3d 209, 215 (3d Cir. 2017); *Matz v. Frank*, 340 F. App'x 323, 327-29 (7th Cir. 2009); *Young v. Quinlan*, 960 F.2d 351, 364 (3d Cir. 1992); *McCray v. Burrell*, 516 F.2d 357, 369 (4th Cir. 1975).

Melendez has been held in solitary confinement for nearly all of the last five years despite the fact that the condition exacerbates his mental illness and places his life at risk. Those facts, alone, suggest that he is likely to succeed on the merits of his Eighth Amendment claim. And, at the very least, they color the remainder of the Eighth Amendment analysis. *See Wilson v. Seiter*, 501 U.S. 294, 304 (1991)

(explaining that conditions of confinement can establish an Eighth Amendment violation "in combination" where they have a "mutually enforcing effect").

Melendez's prolonged solitary confinement is also unconstitutional because it is "arbitrary and 'without penological justification.'" *Quintanilla*, 730 F. App'x at 747. Correctional staff recognize that he does not pose a serious risk to security. D.E. 171-6 at 5; *see also id.* at 6-7. And FDC has alternative housing where Melendez can receive treatment for his mental illness. D.E. 171-1 at 29-30. Under these circumstances, continuing to hold Melendez in solitary confinement, which has exacerbated his mental illness and caused him serious physical injury, rather than transferring him to an appropriate mental health treatment unit, does not serve a legitimate penological purpose.

Melendez has been denied the basic human need of out-of-cell exercise because he has been confined, with rare exceptions, for most of the past five years. Exercise is a basic human need, critical to physical and psychological well-being, the deprivation of which violates the Eighth Amendment. *Wilson*, 501 U.S. at 304-05; *see also Walker v. Mintzes*, 771 F.2d 920, 924, 926-27 & n.3 (6th Cir. 2016); *Gates v. Cook*, 376 F.3d 323, 335 (5th Cir. 2004); *Delaney v. DeTella*, 256 F.3d 679, 684 (7th Cir. 2001); *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 810 (10th Cir. 1999); *Mitchell v. Rice*, 954 F.2d 187, 192 (4th Cir. 1992); *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir. 1985); *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir.

1979). Indeed, the restriction of Melendez's exercise is far more severe than contemplated by FDC's own regulations. While out-of-cell exercise can sometimes be denied on a short-term basis to prisoners who commit serious violations, like stabbing an officer or attempting escape, *Bass v. Perrin,* 170 F.3d 1312, 1315, 1317 (11th Cir. 1999), Melendez's disciplinary history—even if FDC's characterization of it is accurate—is a far cry from that which could conceivably permit the deprivation. Thus, FDC's denial of exercise, despite the lack of a compelling security risk, senselessly deprives Melendez of his basic need for exercise.

Melendez has also been deprived of his Eighth Amendment right to basic sanitation. Prisoners have a right to the fundamental elements of hygiene. *Brooks v. Warden*, 800 F.3d 1295, 1303 (11th Cir. 2015); *Chandler v. Baird*, 926 F.2d 1057, 1065 (11th Cir. 1991); *see also Hill v. Nicholson*, 829 F. App'x. 141, 143 (7th Cir. 2020); *Rivera v. Mathena*, 795 F. App'x 169, 173 (4th Cir. 2019); *Budd v. Motley*, 711 F.3d 840, 843 (7th Cir. 2013); *Palmer v. Johnson*, 193 F.3d 346, 353-54 (5th Cir. 1999); *Parrish v. Johnson*, 800 F.2d 600, 609 (6th Cir. 1986). And while, according to FDC's policy, CM prisoners should be able to shower three times a week, Fla. Admin. Code R. 33-601.800(10)(e)(1), officers routinely deny Melendez this opportunity, including recently for weeks at a time, D.E. 171-2 at ¶¶ 18, 19. Because Melendez was forced to go without showering, he developed sores on his legs that caused a staph infection. *Id.* ¶ 18.

FDC barely contests any of these points. Its primary argument on the objective prong is that the district court abused its discretion in concluding that "Melendez satisfied the objective prong simply because he was in restrictive housing for an extended period of time." OB28. It is remarkable that FDC believes Melendez's allegations amount to merely being held "in restrictive housing for an extended period of time." To the contrary, Melendez alleged specific circumstances that make his particular restrictive housing constitutionally insufficient: it causes him extreme psychological and physical harm and even places his life at risk; it is imposed without penological necessity; and these "clear constitutional problems," *Apodaca v. Raemisch*, 139 S. Ct. 5, 10 (2018) (statement of Sotomayor, J., respecting denial of certiorari), are compounded by the deprivation of exercise and sanitation.

FDC also dedicates several pages to explaining why Melendez's placement in solitary confinement was appropriate under prison policy even though his most serious disciplinary report, for conduct that occurred while being brought back to consciousness from a suicide attempt, was overturned. OB31-33. But even if FDC's interpretation of its own policies is valid, it misses the forest for the trees. FDC does not explain why Melendez's record justifies placing him in solitary confinement for *more than five years*. Nor does FDC explain how their own classification system could deem Melendez a "mild" security risk, with a score one-tenth of that required to be deemed a "very severe" risk, if he is as dangerous as they suggest.

**b.** **The FDC Is Deliberately Indifferent To The Severe Risk To Melendez's Health.**

Melendez is also likely to prevail on the second part of his conditions of confinement claim because Defendant prison officials have repeatedly demonstrated deliberate indifference to Melendez's suffering. Prison officials are subjectively liable when they know of a "risk of serious harm" and fail to "respond reasonably to this risk." *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014) (citation omitted).

FDC is aware of the risk of serious harm to Melendez because of his extended isolation and his history of self-harm and self-mutilation. Indeed, the risks of extended time in solitary confinement are so obvious that Secretary Inch, Regional Director Palmer, Warden Davis and Assistant Warden McClellan cannot claim to be unaware of them. *See, e.g.*, *Davis v. Ayala*, 576 U.S. 257, 289 (2015) (Kennedy, J., concurring) ("[R]esearch still confirms what this Court suggested over a century ago: Years on end of near-total isolation exact a terrible price."). Warden Davis and Assistant Warden McClellan are regularly in the solitary confinement units, conducting rounds and observing conditions, *see* D.E. 134 ¶¶ 17, 18; D.E. 161 ¶¶ 17, 18, and Melendez has an extensive history of filing grievances and complaints seeking help, D.E. 171-1 at 17-18.

FDC has also long been aware of the ongoing harm to Melendez because of Melendez's ongoing efforts to remediate his condition via repeated notice from his

counsel. *See* D.E. 171-9 ¶¶ 2-9. Counsel for Melendez wrote to the FSP warden on July 18, 2018, notifying him that "Melendez ha[d] been in close management since September 2016," "reports spending 24 hours a day in his cell," and that "his mental health ha[d] deteriorated substantially." D.E. 171-9 ¶ 2, Att. A. Counsel reported that Melendez had a psychological crisis in solitary confinement on or about July 16, 2018, that officers refused to take him to the medical unit, and that Melendez then punctured a vein in his arm with a foreign object. D.E. 171-9 ¶ 2, Att. A; *see also* 171-4. Assistant Warden McClellan acknowledged receipt of this letter. D.E. 171-9 ¶ 3, Att. B.

Counsel also wrote to Regional Director Palmer on August 4, 2020, alerting him to Melendez's July 28, 2020 self-injury, Melendez's "multiple instances of self-mutilation" in isolation, and his need for intensive psychiatric care. D.E. 171-9 ¶ 4, Att. C. The correspondence specifically requested that Regional Director Palmer ensure Melendez not be punished or placed in isolation for these events. D.E. 171-9 ¶ 4, Att. C. And after Melendez's return to FDC's custody and his recent self-injury, counsel continued to notify FDC of the danger to Melendez. D.E. 171-9 ¶¶ 5-9.

On top of these specific instances in which FDC was placed on notice of the distinct danger solitary confinement posed to Melendez, FDC has generally ignored the many warning signs accumulated during Melendez's solitary confinement. Melendez's psychiatric history is filled with reports of self-injury and attempted

suicide. D.E. 171-2 ¶¶ 2, 8, 9, 10, 23, 30, 34, 39. Most recently, he inserted metal nails into his arm, which FDC was aware of but chose not to treat for two weeks. D.E. 171-2 ¶¶ 30-33. Given FDC's awareness of Melendez's recurring self-harm, it cannot seriously assert a lack of knowledge that Melendez's conditions of confinement are hurting him. *See* D.E. 171-3 at 1, 8-12, 15, 17, 22, 23; *cf. Perez v. Cox*, 788 F. App'x 438, 441 n.2 (9th Cir. 2019) ("[I]t is reasonable to infer that prison supervisors knew of events that took place within their prison.").

Despite this knowledge, FDC has refused to remove Melendez from solitary confinement or even to provide him with adequate psychiatric care or medication. Assistant Warden McClellan chaired the hearing directly following Melendez's July 2018 incident of self-harm and he elected to continue Melendez's stay in solitary confinement. D.E. 171-2 ¶ 6. FDC proceeded with Melendez's 2020 referral to CM status, even after counsel explained the circumstances of the July 28 self-injury and the assault on Melendez to Regional Director Palmer. And, while keeping Melendez on CM status despite its obvious torturous effects on him, FDC has provided him "grossly deficient" psychiatric treatment. D.E. 171-1 at 26. In light of this history, and Melendez's ongoing self-injury, FDC's insistence on keeping Melendez in solitary confinement represents deliberate indifference.

FDC's arguments to the contrary again refuse to acknowledge facts that are plain from the record. FDC suggests that the only evidence of its subjective

knowledge of Melendez's suffering was "that [Defendant] McClellan acknowledged receipt of [a] letter" sent by Melendez's counsel. OB28. Even if this fact fails to establish FDC's knowledge, FDC ignores the substantial, specific evidence, detailed above, of their awareness that Melendez endured brutal harms in solitary confinement. Indeed, one of the central allegations in this case is that FDC knew Melendez had inserted metal nails into his arm and refused to help him remove them until his counsel objected. That behavior is definitional deliberate indifference.

FDC also asserts that it lacks subjective culpability because "Melendez was being offered mental health treatment, just not in the manner he desired[,]" but this argument was raised and sensibly rejected below. *See* OB29. The district court noted that "Defendants [did] not provide the records that allegedly show [Melendez] has refused half of the individual sessions or mental health screenings that he was offered"; that "prison officials downplay or ignore [Melendez's] suicidal gestures and return [him] to solitary confinement after such incidents"; that "mental health professionals at [the prison] do not intervene when [Melendez] unilaterally refuses mental health treatment"; and that "prison mental health professionals do not recognize or record the extent of [Melendez's] psychosis." D.E. 203 at 15-16. Those findings, none of which FDC substantively contests on appeal, conclusively establish that they did not seriously endeavor to provide Melendez with adequate psychiatric care.

## 2. Melendez Will Suffer Irreparable Harm Absent An Injunction.

Melendez will suffer irreparable harm in the absence of the injunction. Harm is irreparable if it is not compensable with money. *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987). "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)) (internal quotation marks omitted). In *Thomas v. Bryant*, this Court held that a mentally ill prisoner who alleged a fear of being pepper-sprayed had demonstrated irreparable harm. 614 F.3d at 1319. And it did so despite the fact that the prisoner was not even housed at the facility where he feared being pepper sprayed. *Id.*

The risk of irreparable harm in this case is far worse: such harm has already occurred and is ongoing. Melendez experiences daily mental anguish and frequent bodily harm, and reasonably fears similar and worsening future harm if left in solitary confinement. Like the plaintiff who was pepper-sprayed during a psychotic break in *Thomas*, these psychological and physical injuries arise from insensitivity to Melendez's psychiatric needs and cannot be compensated with money. Indeed, the potential for continuing irreparable harm to Melendez is grave. Kupers has warned that Melendez is at extremely high risk of suicide due to his worsening mental illness. D.E. 171-1 at 3, 20-21, 30-31. He found that Melendez's mental illness has been exacerbated by the extreme stress of solitary confinement and the

deprivations Melendez has endured: social isolation, lack of recreation, and lack of adequate mental health care. D.E. 171-1 at 21, 23-26. Since entering solitary confinement in 2016, Melendez's depression has worsened, his thoughts of suicide have become more frequent, and he has had regular auditory hallucinations. *Id.* at 14. He is suffering a severe mental breakdown that is disabling and dangerous to his health. *Id.* at 23-24. He feels intense despair and paranoia, and he continues to self-harm. *Id.* at 23-24, 30-31. He suffers persistent sleep deprivation, fearing that officers will enter his cell and beat him. *Id.* at 13. And he has persistent suicidal ideation. *Id.* at 13-14.

The circumstances that threaten irreparable harm to Melendez will not be remediated absent an injunction. The inadequate mental health treatment available to Melendez in solitary confinement does not mitigate the risk to him from ongoing isolation. *See Finley*, 723 F. App'x at 298-99 (explaining that providing mental health treatment to a prisoner whose mental health condition is worsened by solitary confinement, while leaving him in solitary confinement, is "like bandaging a person's broken leg but then taking away his crutches"). Solitary confinement greatly increases the harm to Melendez, meaning that he needs to be removed from such conditions to recover. D.E. 171-1 at 31. Moreover, Kupers has concluded that Melendez's existing mental health treatment is "grossly deficient." *Id.* at 26. He

found that Melendez's depression, suicidal incidents, and paranoia are largely ignored by mental health staff. *Id.* at 28.

Melendez is also at immediate risk of further irreparable harm because of the deleterious effect of extended solitary confinement on the brain. Research has shown that solitary confinement causes trauma, physical changes to the brain's neurological pathways, and structural changes to the regions of the brain responsible for memory, spatial orientation, and emotion regulation. *Id.* at 9-11. These findings suggest that Melendez has been and will continue to be irreparably harmed neurologically by his extended solitary confinement.

Melendez experiences daily mental pain and anguish from his ongoing isolation, displaying symptoms of paranoia, anger, despair, memory loss, and problems with concentration. *Id.* at 23-24. He endures hallucinations directing him to self-harm. *Id.* at 14; D.E. 171-2 ¶ 23. There is no remedy at law for the harms Melendez will suffer from the ongoing violation of his rights.[10]

---

[10] FDC argues that the district court failed to find that transfer to inpatient psychiatric care would be the least intrusive means of remedying the Eighth Amendment violation and suggest that Melendez could instead be transferred to less-restrictive solitary confinement. OB34-35. This argument was not raised below and is therefore waived. *See Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998) (per curiam). Regardless, given the well-documented effect of solitary confinement on Melendez and his acute need for inpatient psychiatric care, it should be obvious why the district court did not consider less-restrictive solitary confinement as a possible remedy.

### 3. The Balance Of The Harms And The Public Interest Weigh In Favor Of The Preliminary Injunction.

The balance of the harms weighs strongly in favor of maintaining the injunction. A risk of irreparable harm to a prisoner's constitutional rights outweighs a prison's burden of ameliorating it. *Jones v. Caruso*, 569 F.3d 258, 277 (11th Cir. 2009); *see also Edmisten v. Werholtz*, 287 F. App'x 728, 734 (10th Cir. 2008). Here, Melendez is at "extremely high risk of suicide" and further self-injury. D.E. 171-1 at 30. By contrast, it is not burdensome for FDC to transfer Melendez for inpatient mental health treatment. This point is demonstrated most clearly by the fact that they already did so and no harm resulted: Since his release from solitary confinement, Melendez has had no issues with security, received no disciplinary violations, and was consistently deemed cooperative by staff in the inpatient mental health unit. D.E. 220-2 ¶ 13; D.E. 225-1 at 47. And despite FDC's insistence that the injunction would endanger other prisoners and generally interfere with their management of their facilities, FDC has not been able to point to a single actual harm suffered from their implementation of the injunction. *See* OB35-38 (raising many concerns about the effects of the order but not pointing to any evidence that these concerns are more than nightmare speculation). Melendez is a 62-year-old man, who poses a danger only to himself. D.E. 171-6 at 2-6. And FDC has two units that provide appropriate inpatient mental health treatment; that these options exist lessens the burden.

As to the public interest, the public has a strong interest in protecting constitutional rights, particularly the rights of vulnerable people in state-run institutions. "[T]he public interest is served when constitutional rights are protected." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019); *see also Poretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021) ("The public has an interest in ensuring the continued dignity of individuals incarcerated in federal prisons and inherent in that dignity is the recognition of serious medical needs, and their adequate and effective treatment pursuant to the Eighth Amendment's mandated standard of care." (cleaned up)); *Edmisten*, 287 F. App'x at 735 (upholding preliminary injunction requiring medical treatment for prisoner because "the public has an interest in protecting the civil rights of all persons under the Constitution"). The public is also better served when prisoners receive rehabilitative care, not punishment. Melendez is due to be released in less than three years. *See* Florida Dep't of Corr., *Corrections Offender Network*, http://www.dc.state.fl.us/offenderSearch/ (last accessed January 5, 2022) (reflecting release date of May 26, 2024). The public interest will be furthered by addressing Melendez's mental health needs and engaging him in rehabilitative programming that will assist him with becoming a productive member of society.

FDC's arguments to the contrary are unpersuasive. First, FDC argues, without elaboration, that the injunction infringed upon the proper separation of powers.

OB35. But it is black-letter law that federal courts can order prison authorities to comply with the Constitution, *e.g.*, *Brown*, 563 U.S. at 499-502 (approving injunction of entire California prison system), and the injunction in this case concerns only a single prisoner. Next, FDC argues that the district court ignored the potential danger Melendez supposedly poses to other prisoners. OB35-36. But, as noted, Melendez has not harmed anyone or committed any violations since he was transferred, FDC's own risk-assessment algorithm categorizes Melendez as a mild risk, and FDC badly exaggerates the severity of his disciplinary history. Finally, FDC complains that releasing Melendez to the prison's General Population is overly dangerous. OB36. But Melendez was never ordered released to the General Population.

### C. The Injunction Complied With The PLRA.

The district court's order complied with the PLRA's requirement that relief be necessary, narrowly drawn, and no more intrusive than needed. *See* 18 U.S.C. § 3626(a)(1)(A). FDC contends that the district court "did not make any findings whatsoever" as to narrowness or intrusiveness and that this failure requires reversal. OB25. But FDC is incorrect.

As to narrowness, the district court properly found that its ordered relief was narrowly drawn under 18 U.S.C. § 3626(a)(1)(A). D.E. 203 at 22-23. The district court did not mandate Melendez's transfer to the General Population, as FDC

contends.[11] Instead, it required that: (1) Melendez be moved to a psychiatric unit until he is "medically and psychologically capable" of placement in general population, and (2) Melendez's interactions with staff be filmed. D.E. 189. Although FDC has twisted the first instruction into a directive to return Melendez to general population, the district court referred to Melendez's capability of returning to General Population merely as a benchmark for improvements in Melendez's mental state.[12] And in setting this benchmark, the district court properly explained why it was necessary: the court detailed Melendez's mental illness, high risk of suicide, and other significant psychological impairments; examined the negative effects of solitary on his mental illness; and explained the way to alleviate them, i.e., by placing Melendez in a psychiatric ward. D.E. 203 at 22-23.

FDC's argument that the district court did not determine that the relief granted was the least intrusive means necessary to correct the harm, under § 3626(a)(1)(A), is also misplaced. The district court was mindful of its obligation to "afford deference to prison administrators," D.E. 203 at 23, as well as the PLRA's

---

[11] It's somewhat odd that FDC insists that it was ordered to transfer Melendez to the General Population, given that it did not do so and neither Melendez nor the district court has complained. For the same reason, FDC's argument that the district court abused its discretion in ordering Melendez transferred to the General Population because he did not request that relief also fails. *See* OB23-24.

[12] To be sure, the district court made comments at the motion hearing that suggested it might order Melendez returned to the General Population. But the written order makes clear that no such relief was ordered. D.E. 203 at 22-23.

requirements, and therefore adequately considered the intrusiveness requirement. The district court explained that, because FDC already maintains inpatient psychiatric treatment facilities, the intrusion would be "miniscule." PO.Ex.1 at 55:19. The district court echoed those findings in the written order, calling Melendez's transfer a "minor intrusion." D.E. 203 at 22. Given that Melendez has repeatedly self-mutilated while in solitary confinement, it is difficult to imagine what relief besides a transfer would suffice. Similar injunctive relief is routinely upheld. *E.g.*, *Poretti*, 11 F.4th at 1051 (holding that injunction requiring treatment plan and medication for a mentally ill prisoner complied with § 3626(a)(1)); *Morales Feliciano v. Rullan*, 378 F.3d 42, 54-55 (1st Cir. 2004) (holding that an injunction requiring privatization of Puerto Rico's prison mental-health system to remedy ongoing Eighth Amendment violations complied with § 3626(a)(1)). As for the mandate to videotape Melendez's interactions, the court explained that to the extent it was intrusive, it was designed to ensure the injunction's effectiveness, PO.Ex.1 at 59-60, and was necessary to safeguard all parties, D.E. 203 at 23.

FDC also appears to contend that the district court's failure to specifically invoke § 3626(a)(1)(A) rendered its order unenforceable. *See* OB25. While the district court did not specifically invoke § 3626(a)(1)(A), it was obviously mindful

of its requirements in reaching its holding, as detailed above. The statute's plain language requires nothing more. *See* 18 U.S.C. § 3626(a)(1)(A).[13]

### D. FDC's Remaining Arguments Are Beyond Frivolous.

FDC offers three additional arguments against the injunction: that Melendez's claim ultimately sounds only in medical malpractice; that Melendez's suit is a disguised habeas petition; and that Melendez's claim turns on a non-existent right to be housed in the facility of his choosing. None of these arguments can be taken seriously.

First, FDC's argument that Melendez's Eighth Amendment claim is "[l]ikely to [f]ail" because it is a "thinly veiled medical malpractice claim[]," OB43, fails for an obvious reason: Melendez did not plead a claim for deliberate indifference to his medical needs. Rather, he has alleged a conditions-of-confinement claim. And while this Court has held that in some circumstances, a deliberate-indifference-to-medical-

---

[13] For similar reasons, the injunction satisfied the "principles of comity" set out in § 3626(a)(1)(B), which provides that the relief ordered cannot require a defendant to violate state law except under certain circumstances. *See Ga. Advoc. Off.*, 4 F.4th at 1206 (citing 18 U.S.C. § 3626(a)(1)(B)). As an initial matter, Defendants did not raise that subsection in their Opening Brief and therefore waived any recourse to it. Regardless, nothing in the preliminary injunction requires Defendants to violate state law, which plainly permits the transfer of prisoners between facilities. *See Jenkins v. Dep't of Corr.*, 518 S.E.2d 730, 733 (Ga. Ct. App. 1999) ("[T]he Department has the right to make prison to prison transfers."). And even if it did, the injunction meets the exception described in the statute: it is consistent with federal law, necessary to correct the Eighth Amendment violation here, and no other relief could adequately do so. *See supra* at 48-49.

needs claim may be better cast as a medical malpractice claim, it has never suggested, much less held, that a conditions-of-confinement claim might be a malpractice claim in disguise. Unsurprisingly, all of the authority FDC cites in support of its argument that Melendez's claim is a "thinly veiled medical malpractice claim" involves deliberate-indifference-to-medical-needs claims.[14]

Second, FDC argues that Melendez's claim is not actionable because it is, at core, a challenge to the length of his sentence. OB45. This argument does not pass the straight-face test. Melendez seeks to be released from solitary confinement and placed in inpatient psychiatric care *within FDC's custody*. No court has ever held, or could ever hold, that such a request relates to the length of the sentence. The case FDC cites for this argument involved a section 1983 complaint that merely "reiterated [the plaintiff's] arguments from his failed … [habeas] petition." *Hutcherson v. Riley*, 468 F.3d 750, 753 (11th Cir. 2006). By contrast, Melendez's complaint is entirely agnostic as to the lawfulness of his original conviction; his claims are directed solely at how he is treated in custody.

FDC also erroneously contends that the district court abused its discretion in ordering Melendez's transfer because "inmates do not have a constitutional right to

---

[14] FDC also cites cases distinguishing between ADA and medical malpractice claims. OB43. Melendez only argued below that the injunction was justified by his Eighth Amendment claim, so the purported ADA distinction is even less relevant.

remain in or be transferred to an institution of their choosing." OB41. Melendez agrees that there is no such right—but he never invoked one. Instead, he has invoked his Eighth Amendment rights, which could only be vindicated by removing him from solitary confinement and transferring him to one of FDC's two facilities that can provide adequate psychiatric care. By contrast, the cases on which FDC relies involved prisoners who wished to be housed in a particular state or region under circumstances where they had no *due process* right to a transfer. *See Olim v. Wakinekona*, 461 U.S. 238, 246 (1983) (prisoner did not have right to be housed in Hawaii rather than California); *Montayne v. Haymes*, 427 U.S. 236, 243 (1976) (similar); *Meachum v. Fano*, 427 U.S. 215, 228 (1976) (similar). Unlike in those cases, Melendez does not wish to be housed in a given prison because of convenience or geographical location. He *must* be housed in one of the appropriate facilities maintained by FDC because *he will die otherwise*. In that posture, the district court's order was well within its discretion. *See Coleman v. Brown*, 428 F. App'x 743, 744-45 (9th Cir. 2011) (approving order "accelerat[ing] admissions to [California's] mental health facilities").

Finally, FDC argues that the injunction is "procedurally improper in that it purports to enjoin individual defendants[.]" OB46. FDC initially suggests that the problem in this regard is the district court's failure to discuss the individual Defendants' qualified immunity. But qualified immunity—which shields

individuals only from paying damages—is irrelevant to Melendez's ultimate likelihood of success on the merits because Melendez has always sought permanent injunctive relief. *Ratliff v. Dekalb County*, 62 F.3d 338, 340 n.4 (11th Cir. 1995) ("[Q]ualified immunity may not be effectively asserted as a defense to a claim for declaratory or injunctive relief."); D.E. 134 ¶¶ 154, 178, 193, 208, 288, 298, 310, 330, 345. FDC also seems to argue that the district court had to make separate need-narrowness-intrusiveness findings under § 3626(a)(2) as to each of the individual Defendants. OB46. But FDC cites no relevant caselaw for this proposition—because there is none—and nothing in the text of § 3626(a)(2) suggests that such findings are necessary. *See* 18 U.S.C. § 3626(a)(2). Indeed, the main case on which FDC relies makes clear that each "separate form[] of *relief*," not the same relief against various related defendants, is what must be justified under § 3626(a)(2). *See Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1279 (11th Cir. 2020) (emphasis added).

## CONCLUSION

FDC's interlocutory appeal of an expired preliminary injunction should be dismissed for lack of jurisdiction. In the alternative, the district court's order should be affirmed.

Respectfully submitted,

Date: January 12, 2022

Lee D. Wedekind, III
NELSON MULLINS RILEY &
SCARBOROUGH LLP
50 North Laura St., Ste. 4100
Jacksonville, FL 32202

David F. Oyer*
RODERICK & SOLANGE MACARTHUR
JUSTICE CENTER
501 H St. NE, Suite 275
Washington, DC 20002

*Admitted only in California and
practicing under supervision of the
MacArthur Justice Center

/s/ Daniel M. Greenfield

Daniel M. Greenfield
Alexa Van Brunt
Rosalind Dillon
Danielle Berkowsky (*pro hac vice*)
Noor Tarabishy (*pro hac vice*)
RODERICK AND SOLANGE MACARTHUR
JUSTICE CENTER
NORTHWESTERN PRITZKER
SCHOOL OF LAW
375 East Chicago Ave.
Chicago, Illinois 60611
(312) 503-8538
daniel-greenfield@law.northwestern.edu

*Attorneys for Plaintiff-Appellee William Hower Melendez*

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

This motion complies with the type-volume limitation of Fed. R. App. P. 32 (a)(7) because it contains 12,413 words, excluding the parts of the motion exempted by Fed. R. App. P. 32(f).

This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word for Office 365 and Times New Roman 14-point font.


Dated: January 12, 2022                      Respectfully submitted,

                                             *s/ Daniel M. Greenfield*
                                             Daniel M. Greenfield

**CERTIFICATE OF SERVICE**

I hereby certify that on January 12, 2022, I electronically filed the foregoing

with the Clerk of the Court for the United States Court of Appeals for the Eleventh

Circuit by using the CM/ECF system. I certify that participants in the case who are

registered CM/ECF users will be served by the CM/ECF system.

Dated: January 12, 2022                              Respectfully submitted,

                                                     *s/ Daniel M. Greenfield*
                                                     Daniel M. Greenfield